**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| SAMANTHA L. DEMASTUS, | ) | CASE NO. 5:16-CV-00836 |
| | ) | |
| Plaintiff, | ) | JUDGE BENITA Y. PEARSON |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner | ) | |
| of Social Security, | ) | |
| | ) | **REPORT AND** |
| Defendant. | ) | **RECOMMENDATION** |

Plaintiff, Samantha L. Demastus ("Plaintiff" or "Demastus"), challenges the final

decision of Defendant, Carolyn W. Colvin, Acting Commissioner of Social Security

("Commissioner"), denying her applications for Disability Insurance Benefits ("DIB"), and

Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act, 42

U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act").  This Court has jurisdiction pursuant to 42 U.S.C. §

405(g).  This case is before the undersigned United States Magistrate Judge pursuant to an

automatic referral under Local Rule 72.2(b) for preparation of a Report and Recommendation.

For the reasons set forth below, the Magistrate Judge recommends that the Commissioner's final

decision be VACATED and this matter REMANDED.

1

# I.    PROCEDURAL HISTORY

On May 20, 2013, Plaintiff filed applications for DIB and SSI  alleging a disability onset date of April 16, 2013 and claiming she was disabled due to anxiety, impulse disorder, OCD, possible ADHD, depression, [and] migraine."  (Transcript ("Tr.") 278, 440-47).  The applications were denied initially and upon reconsideration, and Plaintiff requested a hearing before an administrative law judge ("ALJ").  (Tr. 153-54, 183-84).

On April 15, 2015, an ALJ held a hearing, during which Plaintiff, represented by counsel, and an impartial vocational expert ("VE"), testified.  (Tr. 85-108).  On May 14, 2015, the ALJ issued a written decision finding Plaintiff was not disabled.  (Tr. 17).  The ALJ' s decision became final on February 12, 2016, when the Appeals Council declined further review.  (Tr. 1-5).

On April 8, 2016, Plaintiff filed her complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos.11, 14, 15).  Plaintiff asserts the following assignments of error:

(1)  The ALJ improperly evaluated the medical opinion of Gertrude P. Cotiaux, M.D. in violation of the treating physician rule

(2)  The ALJ improperly evaluated the medical opinion of Nalini Morris, D.O., in violation of the treating physician rule

(Doc. No. 11 at 1)

# II.    EVIDENCE

## A.    Personal and Vocational Evidence

Plaintiff was born January 8, 1980 and was 33 years-old at the time of her administrative hearing, making her a younger person under social security regulations.  (Tr. 26).  *See* 20 C.F.R.

2

§§ 404.1563 & 416.963.  She has a high school education and is able to communicate in English.  (*Id.*)  Plaintiff has past relevant work as a collector, a home health aide, and a food worker.  *Id.*

**B.      Relevant Medical Evidence**

On April 30, 2013, Plaintiff presented to her primary care physician Gertrude P. Cotiaux, M.D., complaining of anxiety, difficulty concentrating, excessive worry, fatigue, insomnia, irritability, nervousness, and panic attacks.  (Tr. 457).  On June 3, 2013, Plaintiff presented with depression.  (Tr. 455).  Symptoms included loss of interest, depressed mood, fatigue, sense of failure, poor concentration, indecisiveness, psychomotor retardation, poor sleep, hypersomnia, headaches, and irritability.  (Tr. 455).  Dr. Cotiaux diagnosed depressive disorder, an anxiety state, and migraine, which was stable at the time.  (Tr. 455).  Dr. Cotiaux did not perform a mental status examination at that time.  (Tr. 455).  Plaintiff's medications were adjusted, and it was noted that Plaintiff had poor compliance with treatment.  (Tr. 456).

On October 7, 2013, Plaintiff established psychiatric care at Phoenix Rising Behavioral Healthcare and Recovery ("Phoenix Rising").  (Tr. 512).  Plaintiff reported issues with her current medications: Wellbutrin decreased mood symptoms (crying spells, and anger and aggression issues) but increased her anxiety symptoms; and Ativan gave her "medicine head."  (Tr. 512).  She reported receiving "write-ups" from her prior employer for absenteeism, tardiness, and inability to perform tasks.  (Tr. 513).  The clinician observed Plaintiff opening doors with sleeves and elbows and using hand sanitizer.  (Tr. 521).

A mental status examination revealed appropriate demeanor and eye contact; cooperative but restless behavior, moderately rapid speech; euthymic mood and full affect; intact thought content and processes; mild flight of ideas; impairments of memory and attention/concentration;

3

and good insight and judgment.  (Tr. 524).  Plaintiff was diagnosed with episodic mood disorder and generalized anxiety disorder, and she was assigned a GAF[1] score of 58.  (Tr. 521).

An October 14, 2013 progress note from Phoenix Rising shows Plaintiff complained of anxiety, and the clinician observed wringing hands, leg shaking, rapid speech, trembling hands, picking at fingers and legs, changing seat position, crossing and uncrossing legs, and avoiding eye contact.  (Tr. 528).  On October 21, 2013, Plaintiff again presented with anxiety.  (Tr. 527).  She reported a recent conflict with her boyfriend, and she and the clinician discussed relationship issues.  (Tr. 527).  On October 28 and November 4, 2013, Plaintiff complained of emotional issues in connection with her interpersonal relationships.  (Tr. 525, 540).

Plaintiff returned to Phoenix Rising on November 25, 2013.  The progress note reveals that Plaintiff displayed appropriate demeanor, eye contact, and speech.  (Tr. 559).  Her thought processes were logical, and she denied any psychotic symptoms.  (Tr. 559).  Her mood was depressed and anxious, and her affect was constricted.  (Tr. 560).  She behaved cooperatively.  (Tr. 560).  Her attention span and concentration were impaired.  (Tr. 560). She displayed average intelligence.  (Tr. 560).  Plaintiff's medication was adjusted; she was told to continue therapy; and she was assessed with a GAF score of 50.  (Tr. 560-61).

---

[1]     The GAF scale reports a clinician's assessment of an individual's overall level of functioning.  An individual's GAF is rated between 0-100, with lower numbers indicating more severe mental impairments.  A GAF score between 41 and 50 indicates serious symptoms or any serious impairment in social, occupational or school functioning.  A score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.  A recent update of the DSM eliminated the GAF scale because of "its conceptual lack of clarity . . . and questionable psychometrics in routine practice."  See Diagnostic and Statistical Manual of Mental Disorders (DSM-5) at 16 (American Psychiatric Ass'n, 5th ed., 2013).

4

On December 16, 2013, Plaintiff reported to the Phoenix Rising clinician that she stopped taking Prozac due to extreme stomach upset and drowsiness.  (Tr. 537).  She reported occasional suicidal ideation, and complained of racing thoughts.  (Tr. 537).  On September 9, 2014, Plaintiff reported that she was overwhelmed and feeling increased anxiety.  (Tr. 591). It was noted that Plaintiff was crying at times, shaking, and had rapid speech.  (Tr. 589).  On September 30, 2014, Plaintiff reported side effects with her medication, including dizziness from Lamictal and feeling sedated on benzodiazapines.  (Tr. 582).

In October 2014, Stark County Department of Job and Family Services removed Plaintiff's children from her care for excessive discipline.  (Tr. 614-17).

During that time, she received counseling at Behavioral Healthcare and Recovery on a number of occasions.  On October 6, 2014, Plaintiff reported "good mood and reduction in anxious worry today and yesterday," but also noted an increase in depression and anxiety and paranoia the previous week.  (Tr. 578).  On October 13, 2014, plaintiff reported "consistency in mood lability, anxious worry, anger, aggression, and depressive symptomology."  (Tr. 574).  On October 20, 2014, Plaintiff reported increased depressive and anxiety related symptoms due to environmental stress.  (Tr. 570).  November 10, 2014, Plaintiff reported increase in anxious worry but noted progress in recognizing her triggers and urges for impulsivity and irrational behavior.  (Tr. 623).  Plaintiff was prescribed Seroquel and Buspirone, but it was noted that she did not always take her medication as prescribed.  (Tr. 584).

Plaintiff was referred by the Stark County Department of Job and Family Services for an assessment of her capacity to parent her children in a safe and competent manner.  (Tr. 598).  On November 10, 2014, after interviewing Plaintiff, Aimee Thomas, J.D., Ph.D., completed the

5

assessment.  (Tr. 598).  Dr. Thomas indicated that Plaintiff was challenging to interview during portions of the evaluation, as she provided contradictory and tangential responses.  (Tr. 599).  Plaintiff reported forcing her children to stand in the corner from the time they arrived home from school until bedtime.  (Tr. 599).  Although Plaintiff claimed she did not spank her children, she later said that she only did so "on the butt."  (Tr. 599).  However, Plaintiff also reported that the children's paternal grandparents had observed bruises on the children's bodies and had expressed their concern.  (Tr. 600).

Dr. Thomas noted that Plaintiff's thought process was tangential; that she had the tendency to blame others for her life circumstances; and that she did not take personal responsibility for problems associated with her approach to parenting.  Dr. Thomas concluded that Plaintiff met the criteria for dependent personality disorder, generalized anxiety disorder, social anxiety disorder, and panic disorder with agoraphobia.  (Tr. 611).  Dr. Thomas recommended that Plaintiff and her children not be reunified.  (Tr. 616).

C.     **Opinion Evidence**

On April 2, 2013, June 11, 2013, and August 7, 2013, Plaintiff requested leave from her employer, GE.  (Tr. 356, 354, 372).  In a response to GE Disability Benefits Center's request for confidential medical information, Plaintiff's primary care physician Dr. Cotiaux opined that Plaintiff was unable to perform her job functions.  (Tr. 356, 354).  Dr. Cotiaux indicated that Plaintiff had been unable to perform her job since April 30, 2013, and she stated that it was unknown when Plaintiff could return to work.  (Tr. 356).  Dr. Cotiaux stated that Plaintiff had a chronic condition and opined that Plaintiff may miss 6 days per month.  (Tr. 372).

6

On July 11, 2013, James Lyall, Ph.D., performed a consultative mental health evaluation at the request of the state agency.  (Tr. 505-09).  Plaintiff reported that she was depressed at times; and that she generally got along with people as long as they treated her adequately.  (Tr. 508).  Plaintiff recalled three out of three objects immediately and after five minutes.  (Tr. 507).  She repeated six digits forward and five digits backward.  (Tr. 507).  On examination, Dr. Lyall found that Plaintiff was neatly groomed; that she was alert and oriented to time, place, and person; that she interacted cooperatively; and her speech was rapid and over-productive but was generally relevant and coherent; that she may have poor judgment, at times, based on her emotional difficulties.  (Tr. 507).  Dr. Lyall estimated her intellectual functioning was average.  (Tr. 507).

He assessed bipolar disorder and anxiety disorder.  (Tr. 508).  Her symptom GAF score was 55, and her functional GAF score was 65.  (*Id.*).  Dr. Lyall noted that her emotional symptoms may improve if she obtained formal mental health treatment, and that she tended to deny some psychological symptoms.  (*Id.*).  Dr. Lyall opined that Plaintiff "does not appear to be able to handle the work pressure of a fast paced, high production bill collecting job."  (Tr. 509).  He indicated that Plaintiff "might fare better in low key jobs that do not involve a lot of social interaction or emotional content."  (Tr. 509).

On July 25, 2013, Aracelis Rivera, Psy.D., a state agency psychologist, reviewed the medical evidence and concluded that Plaintiff could perform simple and moderately complex work tasks that did not involve production quotas; that Plaintiff could relate superficially with others in a non-public setting that did not involve customer service work requiring resolving conflicts or persuading others to follow demand; and that Plaintiff could adapt to routine work

7

changes.  (Tr. 136-38).  In December 2013, a state agency psychologist, Carl Tishler, Ph.D., reviewed the record and concurred in Dr. Rivera's opinion.  (Tr. 164-66).

In August 2013, Elaine Lewis, M.D., a state agency physician, opined that Plaintiff did not have a severe impairment.  (Tr. 133-34).  On December 19, 2013, Rannie Amiri, M.D. reviewed the updated record and concurred that Plaintiff did not have a severe impairment.  (Tr. 161).

In April 2015, Nalini Morris, M.D., completed an "Assessment of Ability to Do Work-Related Activities (Mental)."  Dr. Morris opined that Plaintiff had no limitations in understanding, remembering, and carrying-out instructions, responding to co-workers and supervisors.  Dr. Morris opined that Plaintiff had mild limitations in maintaining concentration and attention for extended periods.  Dr. Morris opined that Plaintiff had marked limitations in responding to customary work pressures; responding appropriately to changes in the work setting; and behaving in an emotionally stable manner.  (Tr. 639-40).

Dr. Morris opined that due to Demastus' impairments or treatment, she would be absent more than three times per month.  (Tr 640).  Dr. Morris concluded, stating "[s]evere anxiety and depression prevents ability to interact with public and maintain [full-time] employment."  (Tr 640).

//

//

//

//

//

8

### D.        Hearing Testimony[2]

During the hearing, the VE testified Plaintiff had past work as a fast food worker, a home health aide, and a billing collections representative.  (Tr. 120-21).  The ALJ asked the VE to consider a hypothetical individual of Plaintiff's age, education, and work experience,

> without any exertional limitations, . . . [who] should never be exposed to moving mechanical parts; should only be exposed to occasional vibration and again moderate noise exposure who was capable of performing work that involved no exposure to moving mechanical parts; no more than occasional exposure to vibration; no more than moderate exposure to noise, such as levels found in a restaurant or a call center; only simple, routine, repetitive tasks; only simple, work-related decisions; no more than occasional contact with co-workers, supervisors, or the public; no fast paced production requirements; and no more than routine workplace changes.

(Tr. 125-26).  The ALJ further stated that this individual would only have occasional contact with coworkers, supervisors, and the public.  (Tr. 126).

In response, the VE stated that such an individual would be unable to perform Plaintiff's past relevant work.  However, the VE indicated that Plaintiff could perform the representative light occupations of laundry folder, labeler, and sorter, which existed in significant numbers in the national economy.  (Tr. 27, 125).

---

[2]        The Court's initial order states that "**[a]ll facts relevant to the legal issues and discussion must be set forth in the 'Facts' section,**" (See Doc. No. 6 at 3) (emphasis in original), or, to put it another way, any fact not set forth in the fact section is not a fact relevant to the legal issues and discussion.

Although Plaintiff testified at the hearing, neither Plaintiff's brief on the merits nor her reply brief contain any citation or reference to the hearing testimony. Therefore, it is assumed Plaintiff's hearing testimony is not relevant to the legal issues that must be decided in this case.  And, without any input from Plaintiff's counsel as to those portions of Plaintiff's testimony that are relevant here, the Court declines to compile its own summary of Plaintiff's testimony.

### III.    STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).1

A claimant is entitled to a POD only if: (1) she had a disability; (2) she was insured when she became disabled; and (3) she filed while he/she was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

A disabled claimant may also be entitled to receive SSI benefits.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs*., 667 F.2d 524 (6th Cir. 1981).  To receive SSI benefits, a claimant must meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 and 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4).  *See also Ealy v. Comm'r of Soc. Sec*., 594 F.3d 504, 512 (6th Cir. 2010);  *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application.  20 C.F.R. §§ 404.1520(b) *and* 416.920(b).

Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) *and* 416.920(c).  A "severe

impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923.

Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) *and* 416.920(d).

Fourth, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f) *and* 416.920(e)-(f).

For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

## IV.   SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through June 30, 2019.

2.    The claimant has not engaged in substantial gainful activity since April 16, 2013, the alleged onset date (20 CFR 404.1571 et seq., and 416.971 et seq.).

3.    The claimant has the following severe impairments: migraine headaches, anxiety disorder, major depressive disorder, dependent personality disorder, obsessive-compulsive disorder [OCD] (20 CFR 404.1520(c) and 416.920(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

11

5.  After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: The claimant can have no exposure to moving mechanical parts. She can tolerate occasional exposure to vibration. She can tolerate exposure to moderate levels of noise, such as levels found in a restaurant or a call center. The claimant is limited to simple, routine, and repetitive tasks, involving only simple, work-related decisions. The claimant can tolerate occasional contact with coworkers, supervisors, and the public. The claimant is limited to work free of fast paced production requirements involving only routine work place changes.

6.  The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.  The claimant was born on January 7, 1980 and was 33 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.  The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11.  The claimant has not been under a disability, as defined in the Social Security Act, from April 16, 2013, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 17-27).

## V.  STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011).  Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards.  *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).  In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion.  *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.").  This is so because there is a "zone of

choice" within which the Commissioner can act, without the fear of court interference.  *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal.  *See, e.g.,White v. Comm'r of Soc. Sec*., 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec*., 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.")

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."  *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996); accord *Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

//

//

//

# VI.  ANALYSIS

Plaintiff maintains that the ALJ failed to properly weigh, and give good reasons for rejecting, the opinions of treating sources Dr. Cotiaux and Dr. Morris, respectively.  The Court will address the issues relating to each treating source in turn.

A treating source opinion must be given "controlling weight" if such opinion (1) "is well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "is not inconsistent with the other substantial evidence in [the] case record."  *Meece v. Barnhart*, 2006 WL 2271336 at * 4 (6th Cir. Aug. 8, 2006); 20 C.F.R. § 404.1527(c)(2).  However, "a finding that a treating source medical opinion . . . is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected."  *Blakley v. Comm'r of Soc. Sec*., 581 F.3d 399 (6th Cir. 2009) (quoting Soc. Sec. Rul. 96-2p, 1996 SSR LEXIS 9 at *9); *Meece*, 2006 WL 2271336 at * 4 (Even if not entitled to controlling weight, the opinion of a treating physician is generally entitled to more weight than other medical opinions.)  Indeed, "[t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527 and 416.927."  *Blakley*, 581 F.3d at 408.[3]

---

[3]     Pursuant to 20 C.F.R. § 404.1527(c)(2), when not assigning controlling weight to a treating physician's opinion, the Commissioner should consider the length of the relationship and frequency of examination, the nature and extent of the treatment relationship, how well-supported the opinion is by medical signs and laboratory findings, its consistency with the record as a whole, the treating source's specialization, the source's familiarity with the Social Security program and understanding of its evidentiary requirements, and the extent to which the source is familiar with other information in the case record relevant to the decision.

If the ALJ determines a treating source opinion is not entitled to controlling weight, "the ALJ must provide 'good reasons' for discounting [the opinion], reasons that are 'sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007) (quoting Soc. Sec. Ruling 96-2p, 1996 SSR LEXIS 9 at * 5). *See also Gayheart*, 710 F.3d at 376.  The purpose of this requirement is two-fold.  First, a sufficiently clear explanation "'let[s] claimants understand the disposition of their cases,' particularly where a claimant knows that his physician has deemed him disabled and therefore 'might be bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied.'" *Id.* (quoting *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)).  Second, the explanation "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule." *Wilson*, 378 F.3d at 544.  Because of the significance of this requirement, the Sixth Circuit has held that the failure to articulate "good reasons" for discounting a treating physician's opinion "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Rogers*, 486 F.3d at 243.[4]

According to 20 C.F.R. § 404.1527(d)(1), the Social Security Commissioner makes the determination whether a claimant meets the statutory definition of disability.  This necessarily

---

[4]     "On the other hand, opinions from nontreating and nonexamining sources are never assessed for 'controlling weight.'  The Commissioner instead weighs these opinions based on the examining relationship (or lack thereof), specialization, consistency, and supportability, but only if a treating-source opinion is not deemed controlling.  20 C.F.R. § 404.1527(c).  Other factors 'which tend to support or contradict the opinion' may be considered in assessing any type of medical opinion.  *Id.* § 404.1527(c)(6)."  *Gayheart*, 710 F.3d at 376.

includes a review of all the medical findings and other evidence that support a medical source's statement that one is disabled.  "A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled."  *Id*.  It is the Commissioner who must make the final decision on the ultimate issue of disability.  *Duncan*, 801 F.2d at 855; *Harris*, 756 F.2d at 435; *Watkins v. Schweiker*, 667 F.2d 954, 958 n. 1 (11th Cir. 1982).

### 1. Dr. Gertrude Cotiaux

Plaintiff first argues that the ALJ failed to properly weigh, and give good reasons for affording "no weight" to, Dr. Cotiaux's medical opinions relating to Plaintiff's expected absenteeism.  As described above, in 2013, when Plaintiff sought leave from her employer GE, her primary care physician Dr. Cotiaux provided GE with medical information relating to her leave request.  In particular, on August 2, 2012, Dr. Cotiaux opined that from August 7, 2012 to August 7, 2013, it was expected that Plaintiff may be absent from work six days a month.  (Tr. 372).  On January 10, 2012, Dr. Cotiaux opined that from January 11, 2012 to January 11, 2013, Plaintiff may miss four days of work per month.  (Tr. 396).

The ALJ addressed Dr. Cotiaux's opinions:

I give no weight to the opinion of primary care physician Dr. Gertrude P. Cotiaux M.D. who stated on two separate occasions that the claimant would miss either four or six days of work per month due to medical issues (3F23, 47).  I give no weight to these statements from Dr. Cotiaux despite her treating relationship with the claimant because she has not provided any explanation for the symptoms or causes for these alleged missed-days.  Moreover, such conclusions are at odds with the GAF scores, IQ testing, and other observed signs of mental functioning, which all suggest the claimant's issues are not so acute.

(Tr. 25).

17

Substantial evidence supports the ALJ's decision to discount Dr. Cotiaux's opinion. The opinion of a treating physician must be based on sufficient medical data, and upon detailed clinical and diagnostic test evidence.  *See Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993); *Blakley*, 581 F.3d at 406.  Here, Dr. Cotiaux's opinion provided no medical, clinical, or diagnostic basis for the conclusion that Plaintiff may miss four to six days of work every month.  The form filled out by Dr. Cotiaux merely indicates that Plaintiff had "[c]hronic conditions requiring treatment" and that Plaintiff's leave was expected to be "intermittent."  (Tr. 372).  Dr. Cotiaux did not describe the chronic conditions or any specific, related functional limitations, and there is no stated medical basis for her conclusion.

Nor is it clear which of her conditions were the source of the limitation to which Dr. Cotiaux opined.  The Court has reviewed Dr. Cotiaux's treatment notes, and it is apparent that Plaintiff was being treated for migraines, anxiety, and depression.  But, considering Dr. Cotiaux's opinion in light of the treatment notes, it is not readily apparent which of these conditions or what combination of three were the source of the limitation that Plaintiff may be absent from work four to six times every month for an entire year.  An ALJ "is not bound by conclusory statements of doctors, particularly where they are unsupported by detailed objective criteria and documentation."  *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984).  In the Court's view, the ALJ provided an adequate reason for rejecting Dr. Cotiaux's opinion when he stated that she failed to provide "any explanation for the symptoms or causes for these alleged missed days."  This explanation, while succinct, makes sufficiently clear "the weight the adjudicator

18

gave to the treating source's medical opinion and the reasons for that weight.'" *See Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007).

The ALJ further justified his decision to discount Dr. Cotiaux's opinion by pointing out that the expected absenteeism to which Dr. Cotiaux opined is contradicted by other evidence in the record, namely, Plaintiff's GAF scores, her IQ testing, and other observed signs of mental functioning.

As for the GAF scores, the ALJ noted that "Global Assessment of Functioning scores throughout the record have consistently been above fifty, which is suggestive of only some moderate symptoms due to mental health impairments (see e.g. 8F12, 12F4)."  (Tr. 24).  In the Sixth Circuit, an ALJ may discount a treating physician's opinion based, at least in part, on a contradictory GAF score.  *See Gribbins v. Comm'r Soc. Sec. Admin.*, 37 F. App'x 777, 779 (6th Cir. 2002) (opinion a treating physician was properly rejected because it was contradicted by other medical evidence, including another treating physician's GAF score).  Thus, the ALJ was free to consider consistency with Plaintiff's GAF scores when evaluating Dr. Cotiaux's opinion. However, a contradictory GAF score, by itself, is generally not substantial evidence that would undermine an otherwise acceptable treating physician opinion.  *See Purdy v. Comm'r of Soc. Sec.*, No. 15-10949, 2016 WL 4771393, at *8 (E.D. Mich. Aug. 19, 2016) (citing *Gribbins*, 37 F. App'x at 779), report and recommendation adopted, 2016 WL 4761813 (E.D. Mich. Sept. 13, 2016).

In addition, the ALJ did not, but should have, cited specific instances in the record of the "other observed signs of mental functioning," in order to plainly demonstrate how Dr. Cotiaux's opinion was inconsistent with those observed signs.  *See Friend v. Comm'r of Soc.*

*Sec.*, 375 F. App'x 543, 552 (6th Cir. 2010) ("[I]t is not enough to dismiss a treating physician's opinion as 'incompatible' with other evidence of record; there must be some effort to identify the specific discrepancies and to explain why it is the treating physician's conclusion that gets the short end of the stick.").  The ALJ also failed to clearly explain how Plaintiff's average IQ scores contradict Dr. Cotiaux's opinion that Plaintiff may be absent four to six days a month, as it is not readily apparent how intellectual deficits relate to the emotional status of a depressed individual.

Despite these deficiencies in the ALJ's reasoning, the Court is persuaded that the ALJ otherwise sufficiently explained his reasoning for discounting Dr. Cotiaux's opinion.  Here, Dr. Cotiaux's cursory opinion relating to Plaintiff's absenteeism lacked support, and the ALJ appropriately determined and sufficiently explained that the opinion lacked the requisite clinical and diagnostic basis.

### 2. Dr. Nalini Morris

Plaintiff next argues that the ALJ failed to properly weigh, and give good reasons for affording "no weight" to, Dr. Morris's medical opinion.  Dr. Morris opined, *inter alia*, that Plaintiff would on average be absent from work more than three days per month.  The ALJ rejected Dr. Morris's opinions:

> I give no weight to the opinion of treating psychologist Dr. Nalini Morris Ph.D. from Phoenix Rising Behavioral Healthcare and Recovery, who stated in relevant part that the claimant has marked inability to respond to customary work pressures, to respond to changes in work setting, to behave in an emotionally stable manner, and that the claimant will miss more than three days of work per month (17F2-3).  Such opinions appear based primarily on the claimant's subjective allegations, given that the GAF scores from Phoenix Behavioral Healthcare have routinely been above fifty (see e.g., 8F12, 12F4).  Moreover, such an opinion appears overly deferential to the claimant's allegations, without addressing the multiple references in the record of the claimant being a poor historian and lacking candor about her symptoms and other events occurring in her life (13F9).  Overall, I do not take away any persuasive effect from Dr. Morris' opinion as it is generally at odds with the substantial weight of this record.

20

(Tr. 25).

The Court agrees with Plaintiff that these reasons are inadequate.  The ALJ's assertion that Dr. Morris's "opinions appear to be based primarily on the claimant's subjective allegations" is entirely speculative, and there is no citation to the record which would support this inexact and loosely stated assertion.  The ALJ suggests, however, that the existence of GAF scores above fifty supports the claim that Dr. Morris *appeared* to base his opinion on Plaintiff's subjective allegations.  The ALJ specifically cites to GAF scores of 55 and 58, which were notated by clinicians other than Dr. Morris, in treatment notes from Phoenix Behavioral Healthcare.  (Tr. 522, 567).  While Dr. Morris was a physician with Phoenix, there is no basis for attributing these GAF scores to Dr. Morris.  Further, although a GAF score of another physician may be considered when evaluating a treating physician's opinion, a contradictory GAF score by itself is generally an insufficient basis for discounting a treating physician's opinion.  *See Purdy*, No. 15-10949, 2016 WL 4771393, at *8 (citing *Gribbins*, 37 F. App'x at 779).

The ALJ's assertion that Dr. Morris failed to address "multiple references in the record of the claimant being a poor historian and lacking candor about her symptoms" is also inadequate.  First, while the ALJ notes the existence of "multiple references in the record," he cites to only one.  Dr. Aimee Thomas produced a consultative report directed at Stark County Department of Job and Family Services, on the question whether, *inter alia*, Plaintiff should be reunited with her children.  There is no evidence that Dr. Morris contributed to this report or was even aware of it.  Nor does the Commissioner cite to any evidence that Dr. Morris herself independently concluded that Plaintiff was a "poor historian" or "lacking candor," such that the limitations to which Dr. Morris opined might legitimately called into question.

21

Further, the majority of the reasons set forth in the Commissioner's brief were not articulated by the ALJ.  It is well-established that *post hoc* justifications for discounting a treating physician's opinion cannot cure an ALJ's deficient explanation.  As courts within this District have noted, "arguments [crafted by defense counsel] are of no consequence, as it is the opinion given by an administrative agency rather than counsel's '*post hoc* rationale' that is under the Court's consideration."  *See, e.g., Blackburn v. Colvin,* 2013 WL 3967282 at * 8 (N.D. Ohio July 31, 2013); *Cashin v. Colvin*, 2013 WL 3791439 at * 6 (N.D. Ohio July 18, 2013); *Jaworski v. Astrue,* 2012 WL 253320 at * 5 (N.D. Ohio Jan. 26, 2012).  For instance, in this case, to justify the ALJ's rejection of Dr. Morris, the Commissioner points out that Dr. Morris did not examine Plaintiff before offering her opinion; that Dr. Morris's opinion conflicted with Plaintiff's benign mental status examination findings; and that Dr. Morris's opinion conflicted with the findings of consultative examiner Dr. Lyall and the opinions of Dr. Rivera and Dr. Tishler, among others.  The ALJ cited none of these as reasons justifying his rejection Dr. Morris's opinion.  As such, they have no bearing on whether the ALJ complied with the treating physician rule.  They are accordingly rejected.

In addition, the government now claims that despite the ALJ's assertion otherwise, Dr. Morris is not a treating physician.  Therefore, the government claims, the reason giving requirement does not apply in this instance.  The Commissioner's treatment of this issue is far too superficial to allow for meaningful consideration by the Court.  "[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to ... put flesh on its bones." *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th

Cir.1997) (quoting *Citizens Awareness Network, Inc. v. United States Nuclear Regulatory Comm'n*, 59 F.3d 284, 293-94 (1st Cir.1995)).  In this case, the Commissioner cites no law to support its position, no reference to the record, and no argumentation that would allow either Plaintiff and the Court to meaningfully address the argument.[5]  The Court deems this argument waived.

In sum, the Court concludes that the ALJ failed to provide meaningful and adequate reasons for assigning less than controlling weight to the opinion of Dr. Morris.  Even where substantial evidence otherwise supports the decision of the Commissioner, this Court does not "hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician's opinion."  *See Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544-45 (6th Cir. 2004) (quoting *Halloran v. Barnhart*, 362 F.3d 28, 32-33 (2d Cir.2004).  Therefore, this matter will be remanded, so that the ALJ may "comprehensively set forth the reasons for the weight assigned to a treating physician's opinion."  *Id.*

//

//

//

//

---

[5]     In her reply brief, Plaintiff maintains that under Sixth Circuit case law the Commissioner cannot reverse the Agency's prior position after having afforded Dr. Morris treating physician status.  (Doc No. 15 at 3).  Because the Court concludes that the Commissioner waived its argument, the Court need not address Plaintiff's contention.

## VII.    CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be VACATED and this matter be REMANDED to the agency for further proceedings.

   s/ Jonathan D. Greenberg
Jonathan D. Greenberg
United States Magistrate Judge

Date: January 27, 2017

### OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**

24